Christopher Neil SMITH, Plaintiff,

v.

BOB SMITH CHEVROLET, INC., Defendant.

Civil Action No. 3:02–CV–258–H.

United States District Court, W.D. Kentucky, At Louisville.

Aug. 1, 2003.

Jeffrey A. Cross, David B. Mour, Borowitz & Goldsmith, Louisville, KY, for Plaintiff.

Mark S. Fenzel, Jason P.K. Underwood, Middleton & Reutlinger, David William Hemminger, Edward H. Stopher, Boehl, Stopher & Graves, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Christopher Smith ("Plaintiff") alleges that Defendant Bob Smith Chevrolet, Inc. ("Smith Chevrolet") violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, and invaded his privacy in violation of Kentucky common law. Smith Chevrolet has now moved for summary judgment on the grounds that Plaintiff's claims are barred by Kentucky's claim preclusion rule; both parties have moved for sum-

mary judgment on the issue of whether Smith Chevrolet lacked a permissible purpose when it accessed Plaintiff's credit report; Smith Chevrolet moved to dismiss the Kentucky invasion of privacy claim. After thoroughly considering the parties well-written motions and memoranda, the Court is able to resolve all of these issues and denies Smith Chevrolet's motions for summary judgment and finds that Smith Chevrolet did not have a permissible purpose to access Plaintiff's credit report.

## I.

The underlying facts concern the disputed sale of a 2001 GMC Suburban ["Suburban"]. Having decided that he wanted to purchase a car, on December 13, 2000, Plaintiff completed a GMAC credit application to determine his eligibility for financing. On December 23, 2000, Plaintiff went to Smith Chevrolet with the intention of purchasing the Suburban to use on a family Christmas vacation.

After arriving at the dealership, Plaintiff met with a company employee to discuss the terms of the sale. Two factors complicated the sale. First, Plaintiff wanted to trade in his 1997 Mercury Villager. Second, as an employee of General Electric—a General Motors ("GM") supplier—he was entitled to a standard discount upon proof of employment. Although Plaintiff did have the 1997 Mercury Villager to trade-in on December 23, 2000, he did not have the proper documentation needed to secure the discount. Notwithstanding this fact, a Smith Chevrolet representative agreed to sell Plaintiff the Suburban at the GM discounted price provided he proved his entitlement to the full discount at a later date. After calculating the Villager's trade-in value and the GM discount, the two sides agreed on a price and set forth the terms of the sale in a handwritten purchase order.

As part of this agreement, Smith Chevrolet requested that Plaintiff leave a check to cover the amount of his discount, which was $5,226.80, until Plaintiff provided the requisite documentation. After some hesitation and consideration, Plaintiff instead offered to leave a $500.00 check. A Smith Chevrolet representative agreed to accept this lesser amount and then prepared the typewritten purchase order. Thus, after signing the typewritten purchase order and handing over the Villager and his $500.00 check, Plaintiff left the lot with the Suburban. On January 10, 2001, Plaintiff faxed and mailed proof of his eligibility for the GM discount. Shortly thereafter, Plaintiff's bank issued Smith Chevrolet a check in the amount of the balance due.

About a week or ten days later, another dispute arose which gives rise to the current litigation. At that point Smith Chevrolet claims it realized the employee who generated the typewritten Purchase Agreement inadvertently doubled the amount of Plaintiff's discount. Smith Chevrolet contacted Plaintiff, explained the calculation error and told Plaintiff that he owed the dealership more money. Furthermore, Smith Chevrolet told Plaintiff that, until he paid the difference, it refused to transfer the Suburban's title and pay off the outstanding loan attached on the Villager trade-in. These were both actions Smith Chevrolet had promised Plaintiff it would take when Plaintiff left the lot on December 23, 2000.

Following from this dispute, on February 21, 2000, Smith Chevrolet accessed Plaintiff's consumer report. The decision to access Plaintiff's report was made by Drew Smith, Smith Chevrolet's chief executive officer and part-owner. Smith Chevrolet says it accessed Plaintiff's report to determine whether Plaintiff was (1) continuing to make payments on the Villager's loan and (2) maintaining insurance on the

Villager. Plaintiff disputes Smith Chevrolet's motivations in this regard and claims that it simply wanted to invade Plaintiff's privacy.

When the parties could not agree on the amount due, Plaintiff sued Smith Chevrolet in Jefferson Circuit Court for breach of the sale contract. He demanded specific performance so that he could receive the Suburban's title and transfer the Villager loan obligations to Smith Chevrolet. About a year later, a state court jury found in Plaintiff's favor. One day earlier, on May 13, 2002, Plaintiff filed this suit in federal court.

## II.

Before considering the merits of Plaintiff's Fair Credit Reporting Act claim, the Court must first resolve the important question of whether Kentucky's claim preclusion rule bars his FCRA and invasion of privacy claims. Smith Chevrolet, arguing that it does, moved for summary judgment on this issue.[1]

■ The doctrine of *res judicata,* or claim preclusion, provides that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in a prior action. *Kane v. Magna Mixer* Co., 71 F.3d 555, 560 (6th Cir.1995) (*quoting Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)). Under Kentucky law, there are three requirements for the application of *res judicata:*

> First, there must be identity of the parties. Second, there must be identity of the two causes of action. Third, the action must be decided on its merits. In short, the rule of *res judicata* does not act as a bar if there are different issues

or the questions of law presented are different.

*City of Louisville v. Louisville Prof'l Firefighters Ass'n,* 813 S.W.2d 804, 806 (Ky. 1991) (*quoting Newman v. Newman,* 451 S.W.2d 417, 419 (Ky.1970)). Two of the requirements are not in dispute: the same parties are involved in both suits and the state court decided its case on the merits. Thus, the only remaining question is whether there is a sufficient identity of the breach of contract and FCRA claims to support a finding of claim preclusion.

■ As a starting point, Kentucky courts follow the Restatement's transactional approach to analyze the identity of causes of action. *Harris v. Ashley,* 165 F.3d 27, 1998 WL 681219 (6th Cir.1998). This approach "looks beyond the legal theories asserted to see if the two claims stem from the same underlying factual circumstances." *Id.* Thus, in *Dennis v. Fiscal Court of Bullitt County,* 784 S.W.2d 608, 610 (Ky.Ct.App.1990), the Kentucky Court of Appeals held that analyzing the identity of claims requires the Court to look at a "claim" in "factual terms and to make it coterminous with the transaction regardless of the number of substantive theories or variant forms of relief flowing from these theories, that may be available to the plaintiff . . ."

■ More recently, however, the Kentucky Supreme Court has clarified that the rule "is not so broad as to foreclose all possible or potential claims against any known potential defendant not brought within the first litigation." *Watts v. K, S & H,* 957 S.W.2d 233, 236 (Ky. 1997). In *Watts,* the Kentucky Supreme Court clarified the two limitations Kentucky courts recognize to the rule against

---

1. The parties are in agreement that under the Full Faith and Credit Act, 18 U.S.C. § 1738, Kentucky's claim preclusion rule applies to this analysis. In relevant part, the Act re-

quires "federal courts to give preclusive effect to the state-court judgments whenever the courts of the State from which the judgments emerged would do so."

claim splitting. First, the Court held that a prior claim will not preclude a subsequent claim if the subsequent claim had not yet ripened when the prior claim was brought. *Id.* at 237. Second, and particularly relevant in this instance, the Court stated that a prior claim will not preclude a subsequent claim if the prior claim was based on matters which are "not germane to, implied in, or essentially connected with the actual issues in the [second] case although they may affect the ultimate rights of the parties and might have been presented in the former action." *Id.* (*citing Hays v. Sturgill*, 302 Ky. 31, 193 S.W.2d 648 (1946)).

The facts in *Watts* and *Hays* are helpful to understanding the application of this rule. In *Watts*, the Kentucky Supreme Court reversed a decision by the Kentucky Court of Appeals applying *res judicata* to bar a dram shop action where the plaintiff had previously brought a negligence suit against the drunk driver to whom the dram shop defendant had sold liquor. 957 S.W.2d at 236. The *Watts* Court explained that there was no identity between the two causes of action because the first action involved the drunk driver's negligence in operating the vehicle that collided with plaintiff, whereas the second action involved the liquor store's negligence in selling alcohol to the minor who later became drunk and collided with plaintiff. *Id.* To put it in transactional terms, the two cases did not arise from the same set of facts: the negligence action focused on the accident and the dram shop claim focused on the purchase of the alcohol. Thus, the court held, "to utilize the defense that the plaintiff has improperly split the cause of action, the actions must involve relitigation of the same facts and issues." *Id.* at 237.

Similarly, *Hays*, which the *Watt's* Court substantially relied upon in reaching its conclusion, also involved successive suits between the same parties concerning facts arising from the same transaction. Like this case, the first suit involved the construction of an instrument; specifically, was a particular document a deed or a will? In the second suit, the issue was not how to interpret the written document, but turned on whether the grantor was of sound mind and whether certain payments were required under the terms of the deed. 193 S.W.2d at 649. In concluding that there was not sufficient identity of the causes of action, the Court of Appeals noted that,

> Only the construction of the writing was involved in the first case ... A decree of construction of a deed or will does not more than to ascertain and determine the intent of the grantor ... It does not change the status nor augment or diminish its binding force ... A suit seeking to have it adjudged void because of incapacity is an entirely different matter.

*Id.* at 649–51.

Thus, in both *Watts* and *Hays*, Kentucky's highest court concluded that, though the plaintiff could have filed both claims in the original suit, the law did not require doing so where the facts and legal claims were distinct.

■ Applying Kentucky law here, the suit to enforce an agreement does not seem to preclude the second suit, premised on alleged violations of the Fair Credit Reporting Act. Though both lawsuits arise out of an automobile sale, the similarities end there. The breach of contract action stemmed from the sale agreement between Plaintiff and Smith Chevrolet and Smith Chevrolet's subsequent realization that Plaintiff paid less than anticipated. To resolve the contract claim requires a trier of fact to ascertain what the agreed upon purchase price was. The second case stems from Smith Chevrolet's decision to access Plaintiff's credit report on February 21, 2001. To resolve that claim requires

looking at Smith Chevrolet's reasons and intentions when accessing Plaintiff's credit report. In a FCRA case, the main issue is usually the purported purpose for accessing a credit report. More simply put, the first case involves the sale price of an automobile and the second an arguable invasion of privacy. The first judgment is therefore not necessarily conclusive of matters which were "not germane to, implied in or essentially connected with the actual issues in the case although they may affect the ultimate rights of the parties and might have been presented in the former action." 957 S.W.2d at 237. Therefore, one cannot say that the breach of contract and Fair Credit Reporting Act claims involve relitigation of the same issues and facts. Kentucky's claim preclusion rule does not bar this action.

### III.

The Court now turns to the merits of Plaintiff's claim. The heart of his case is the contention that Smith Chevrolet violated the FCRA when it accessed Plaintiff's credit report on February 21, 2001.[2] Specifically, Plaintiff contends Smith Chevrolet is liable for negligently and willfully violating the responsibilities imposed by the FCRA. *See* 15 U.S.C. § 1681o (creating a private cause of action for negligent violations of the FCRA); 15 U.S.C. § 1681n (creating a private cause of action for willful violations). Both sides have filed motions for summary judgment addressing whether Smith Chevrolet had a "permissible purpose" for accessing Plaintiff's credit report. The facts central to this claim are not in dispute. Smith Chev-

rolet may access Plaintiff's credit report only if, as a matter of law, its actions are consistent with one of the permissible purposes set forth in 15 U.S.C. § 1681b(a)(3). *Zeller v. Samia,* 758 F.Supp. 775, 781–82 (D.Mass.1991); *Advanced Conservation Sys. Inc. v. Long Island Lighting Co.,* 934 F.Supp. 53, 54 (E.D.N.Y.1996).

■ The FCRA identifies a limited set of "permissible purposes" for obtaining and using a consumer report. *See* 15 U.S.C. § 1681b(a)(3); *see also* 15 U.S.C. § 1681b(f). Those permissible purposes provide that a person may only access a consumer report if he:

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(B) intends to use the information for employment purposes; or

(C) intends to use the information in connection with the underwriting of insurance involving the consumer; or

(D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

(E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or

---

**2.** The Court notes that, although § 1681b(a)(3) regulates those who furnish consumer reports, none of the parties here dispute the fact—as numerous other courts have recognized—that users of consumer reports are also subject to the regulations set forth therein. *See, e.g., Hansen v. Morgan,* 582 F.2d 1214, 1220 (9th Cir.1978) (noting

that "even consumer reporting agencies acting in complete good faith cannot prohibit illicit use of consumer information if users are not bound to obtain consumer reports only for permissible purposes"); *see also Pappas v. City of Calumet City,* 9 F.Supp.2d 943, 946 (N.D.Ill.1998).

prepayment risks associated with, an existing credit obligation; or

(F) otherwise has a legitimate business need for the information—

(I) in connection with a business transaction that is initiated by the consumer; or

(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

15 U.S.C. § 1681b(a)(3).

In its summary judgment motion, Smith Chevrolet contends it had three bases for accessing Plaintiff's credit report. The Court now addresses each of these arguments.

## A.

First and most persuasively, Smith Chevrolet contends its actions complied with § 1681b(a)(3)(f)(i). That section provides that one may obtain a consumer report if it "has a legitimate business need for the information ... in connection with a business transaction that is initiated by the consumer ..." Smith Chevrolet argues that because the transaction was in dispute, it needed to ascertain the value of its collateral. If it appeared that Plaintiff was not current on his payments for the Mercury Villager, then his indebtedness would have increased over and above the amount owed Smith Chevrolet.

As a starting point, the Court begins with the FCRA's text. The applicability of this permissible purpose boils down to whether Smith Chevrolet's use of the credit report was "in connection with a transaction initiated by the consumer," as the statute uses those terms. That restriction to the actual statutory usage is important here because, in the abstract, it is true Smith Chevrolet accessed Plaintiff's credit report in connection with a transaction Plaintiff at one point initiated. The Court concludes, however, that the statute uses the terms "in connection with a transaction initiated by the consumer" more restrictively.

Turning to the text at issue, when Congress defined the term "consumer report," it stated:

The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—

(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or

(C) any other purpose authorized under section 604 [15 USCS § 1681b].

15 U.S.C. § 1681a(d).

This definition suggests that Congress primarily envisioned consumer reports being disseminated for the purposes of assessing "eligibility." Then, in § 1681b(a)(3), Congress listed additional specific permissible purposes pertaining to the extension of credit, § 1681b(a)(3)(A), collection of an account, § 1681b(a)(3)(A), employment purposes, § 1681b(a)(3)(B), the underwriting of insurance for a consumer, § 1681b(a)(3)(C), determining a consumer's eligibility for a governmental benefit, § 1681b(a)(3)(D), and the valuation of a consumer's credit risk, § 1681b(a)(3)(E). The rule of *ejusdem generis* provides that when general words follow an enumeration of specific terms, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. *Washington State Department of Social and Health Services v.*

*Guardianship Estate of Keffeler,* 537 U.S. 371, 123 S.Ct. 1017, 1025, 154 L.Ed.2d 972 (2003). The definition of "consumer report" therefore includes those reports needed to assess a consumer's eligibility for a benefit, as well as other predictable needs—such as collecting money owed under an agreement and assessing a particular consumer's credit or insurance risk—that arise in the midst of a typical business transaction. In fact, in every one of these situations, the consumer report is obtained either to provide a benefit to a consumer or to collect a pre-existing debt.

Tellingly, the two permissible purposes stated in § 1681b(a)(3)(F) can also be read to effectuate these same ends. That is, § 1681b(a)(3)(F)(i) suggests the retention of a credit report for the purpose of furthering a business transaction initiated by a consumer and § 1681b(a)(3)(F)(ii) permits the use of a credit report to determine whether a consumer continues to be eligible for a benefit. It is a basic principle of statutory construction that a statute should be read and construed as a whole. *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542–43, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). Like the definition of "consumer report" and consistent with the other five specific permissible purposes, these two permissible purposes also suggest that Congress intended to allow access to a consumer report either when that access would benefit a consumer or would facilitate the collection of pre-existing debt.

To be precise, Smith Chevrolet's stated reason for accessing the credit report was not in connection with a standard business transaction that Plaintiff initiated. Instead, and quite significantly in this Court's view, Smith Chevrolet accessed the credit report to determine how much additional money it could collect, apart from what the two parties agreed upon in a standard business transaction. Almost certainly, it did not access Plaintiff's credit report for a reason beneficial to the consumer. Nor did it access the credit report to collect on a pre-existing debt. Rather, it accessed the report for its own business purposes and as part of a new event: the recovery of the duplicative discount. Although this is a fine distinction, it may be an important one. Smith Chevrolet's interpretation of the phrase "in connection with" is limitless. Under its reading, so long as any company had a reason to question any part of a transaction, it could access a consumer's credit report "in connection with a business transaction" that at some point was "initiated by the consumer." That is, five weeks, five months, or five years down the line, Smith Chevrolet could access Plaintiff's credit report if some dispute ever arose about the contracted price. In the Court's view, such an interpretation would give commercial entities an unlimited blank check to access and *reaccess* a consumer credit report long after the typical issues of eligibility, price, and financing were determined. Neither the specific language nor the overall scope of the FCRA can be said to support such an interpretation.

The Federal Trade Commission's own interpretation of the FCRA appears to confirm the Court's view. Under the FCRA, the FTC is the agency empowered to enforce the Act. 15 U.S.C. § 1681s(a). Although the FTC has not issued any rule or regulations addressing the scope of the "legitimate business need" permissible purposes, the FTC has issued commentary and informal opinion letters on the subject. In its commentary on the "legitimate business need," permissible purpose, the FTC stated:

> Under this subsection, a party has a permissible purpose to obtain a consumer report on a consumer for use in connection with some action the consumer takes from which he or she might expect

to receive a benefit that is not more specifically covered by subsections (A), (B), or (C). For example, a consumer report may be obtained on a consumer who applies to rent an apartment, offers to pay for goods with a check, applies for a checking account or similar service, seeks to be included in a computer dating service, or who has sought and received overpayments of government benefits that he has refused to return.

16 CFR Ch. 1, Pt. 600 App.

Similarly, in a series of Informal Staff Opinion Letters, the FTC has echoed this commentary. In one instance when asked to describe the outer bounds of the "legitimate business need" permissible purpose, the FTC wrote that:

[T]he only permissible purpose for which a credit report may be obtained in connection with a new business transaction is to determine the consumer's "eligibility"—i.e., whether the business wishes to undertake a transaction with he consumer. In this regard, we note that the legislative history indicates that Congress intended the "permissible purposes" provisions of the FCRA to cover primarily "eligibility issues" (*see, e.g.,* 116 Cong. Rec. 36,572 (statement of Rep. Sullivan)).

FTC Informal Staff Opinion Letter, William Haynes (Mar. 2, 1998); *see also* FTC Informal Staff Opinion Letter, David Medine (Feb. 11, 1998).

In another case, the FTC considered an argument somewhat analogous to this one, where a landlord sought to obtain a credit report in connection with a tenant's disputed debt. The FTC responded that § 604(a)(3)(F)(i) would certainly permit a landlord to procure a consumer report to evaluate a consumer's rental application (that is, when the lease "transaction . . . is initiated by the consumer.") FTC Informal Staff opinion Letter, Clarke Brinckerhoff (July 7, 2000). However, the FTC

noted, § 604(a)(3)(F)(i) "does not give any business the right to obtain a report on a customer long after the transaction commenced."

"While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect in closing the door on any suggestion that the usual rules of statutory construction should get short shrift for the sake of reading ['legitimate business need'] in abstract breadth." *Washington State Department of Social & Health Service. v. Keffeler,* 537 U.S. 371, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003); *see also Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (holding that "interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference"); *United States v. Mead Corp.,* 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (noting that administrative decisions not subject to *Chevron* deference may be entitled to a lesser degree of deference and that, following *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the agency position should be followed to the extent persuasive). In this case, the FTC's repeated assertions that § 604(a)(3)(F)(i) primarily pertains to "eligibility" issues and does not create a unilateral right to look at someone's credit report seems entirely consistent with the statutory language. The FTC has given the scope of § 604(a)(3)(F)(i) thorough consideration. Its views are certainly persuasive.

Moreover, nearly every federal court addressing this issue has similarly held that the "legitimate business need" permissible purpose should be narrowly construed in the context of the other five enumerated purposes. *See, e.g., Williams v. AT & T*

*Wireless Services., Inc.,* 5 F.Supp.2d 1142 (W.D.Wa.1998); *Trans Union Corp. v. FTC,* 81 F.3d 228, 233–34 (D.C.Cir.1996); *Duncan,* 149 F.3d at 427; *Mone v. Dranow,* 945 F.2d 306 (9th Cir.1991); *Ippolito v. WNS, Inc.,* 864 F.2d 440 (7th Cir.1988); *Hovater v. Equifax, Inc.,* 823 F.2d 413 (11th Cir.1987); *Houghton v. New Jersey Mfrs. Ins. Co.,* 795 F.2d 1144, 1149 (3rd Cir.1986). Bearing this principle in mind, the D.C. Circuit noted in the context of analyzing the scope of § 1681b(a)(3)(F)'s broader predecessor that "the 'legitimate business' catchall of § 1681b(3)(E) is best understood as encompassing the types of business transactions similar to those set forth in subsections (A) through (D), i.e., those for which information gathered for credit (and the other specific purposes) is central." *Trans Union Corp. v. FTC,* 81 F.3d 228, 234 (D.C.Cir.1996). As such, the court, explained, "it seems consistent with this view that information about a consumer ... be kept private except under circumstances in which the consumer could be expected to wish otherwise or, by entering into some relationship with a business, could be said to implicitly waive the Act's privacy to help further that relationship." *Id.*

The Court concludes, therefore, that when Smith Chevrolet accessed Plaintiff's credit report it was not, as a practical matter, part of the transaction which Plaintiff initiated. That transaction, in so far as Plaintiff's eligibility and debt was concerned, ended when the parties created a contract for the car's price and Plaintiff paid that price in full. Under any conceivable interpretation of the facts in this case, Smith Chevrolet cannot be said to have a "legitimate business need" for Plaintiff's credit report "in connection with a transaction initiated by the consumer." § 604(a)(3)(F)(i).

**B.**

 Smith Chevrolet also argues that its actions were protected both by §§ 1681b(3)(A) and 1681b(a)(1)(F)(ii) which provide that:

Any consumer reporting agency may furnish a consumer report under the following circumstances and no other: . . .

(A) to a person which it has reason to believe intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer; or . . .

(F) otherwise has a legitimate business need for the information . . . (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

§ 1681b(a)(1)(A)-(F)(ii).

Smith Chevrolet claims that it had a permissible purpose under both of these provisions because, due to its own error, Plaintiff received twice the discount he was entitled to and so a debt remained. Therefore, Smith Chevrolet says that it was reviewing whether Plaintiff owed any additional debt. And, because reviewing the size of the debt Plaintiff owed is synonymous with "collection of an account" and with determining "whether [Chris Smith] continue[d] to meet the terms of the account," Smith Chevrolet contends it therefore clearly had a permissible purpose.

The problem with this argument is that there was no outstanding debt and, consequently, there was no "account" to collect on. To be sure, Smith Chevrolet thought there *should be* an outstanding debt. Thinking there *should be* a debt, Smith Chevrolet contacted Plaintiff and ordered him to pay. At that point, Plaintiff re-

fused to pay. Only then did Smith Chevrolet accessed Plaintiff's credit report.

Whether a debt or existing account exists simply cannot be a function of whether Smith Chevrolet alleges the existence of a debt.[3] To do so would allow Smith Chevrolet infinite opportunities to access Plaintiff's credit report, so long as he could come up with a reason for thinking the account should continue in existence. As this Court has explained elsewhere, *Scharpf v. AIG Mktg.*, 242 F.Supp.2d 455, 462–64 (W.D.Ky.2003), the FCRA intended to strike a balance between protecting the needs of commerce and the consumer's privacy interest.[4] The Court finds that Smith Chevrolet must have a reasonable belief that the debt existed. Here, Smith Chevrolet's decision to investigate Plaintiff's credit report was not based on a

reasonable belief that debt was owed; it was based on a belief that the original transaction was mistaken. Plaintiff had no reason to suspect that any new debt would arise after the initial transaction was completed. For all practical purposes that transaction was closed when the vehicle was delivered and Plaintiff made his payment. To find these permissible purposes applicable in this instance would extend the FCRA's language well beyond its intended purpose.

## IV.

Both sides have also moved for summary judgment on Plaintiff's claim of willful non-compliance. Section 1681n provides for civil liability in cases where the defendant willfully fails to comply with FCRA. In such a case, punitive damages

---

**3.** The Court notes this is quite different from the case where a consumer pays for a debt with a bad check. *See, e.g., Wright v. Bogs Management, Inc.*, 2000 U.S. Dist. LEXIS 17837 (N.D.Ill.2000). In that case, a debt would clearly remain. In this case, however, the only evidence of debt is that Smith Chevrolet thought a debt should exist.

**4.** As this Court noted in *Scharpf*,

In enacting the FCRA, Congress made four findings, three of which are particularly relevant to the question of law Plaintiff poses. Those pertinent findings state:
(2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.
(3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
(4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.
15 U.S.C. § 1681(a).
In effect, the FCRA created a fair mechanism through which creditors and insurers could obtain a consumer's report in order

to make an offer and evaluate creditworthiness. Conversely, it also established procedures to ensure accuracy and to protect consumer privacy. The FCRA strikes a balance between these two competing ends.
Evidence of this give and take is prevalent throughout the FCRA. When preparing a report, a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy." 15 U.S.C. 1681e(c) (emphasis added). The stated aim is therefore perfection in protecting the consumer, but the burden on the credit reporting agency is only to act reasonably. Similarly, it is presumed that a consumer's privacy will not be violated in the context of a firm offer for a permissible purpose, unless that consumer personally seeks to have her name removed from a consumer reporting agency's list. 15 U.S.C. § 1681b(c). Moreover, if a plaintiff seeks to bring a state law defamation, invasion of privacy, or negligence reporting claim against a consumer reporting agency, she can succeed only upon overcoming the highest standard of malice. 15 U.S.C. § 1681h(e). Last, only after a creditor or insurer takes action against a consumer's interest, is that consumer informed of her right to see their credit report or know that it was used against her. 15 U.S.C. § 1681a(k).
242 F.Supp.2d at 462.

may be awarded. 15 U.S.C. § 1681n(a)(2). This Court has recently explained the standard for liability under § 1681n, stating that, "[t]o show willful noncompliance with the FCRA, [the Plaintiff] must show that [defendant] knowingly and intentionally committed an act in conscious disregard for the rights of others, but need not show malice or evil motive." *Boris v. Choicepoint Servs.*, 249 F.Supp.2d 851, 862 (W.D.Ky.2003) (*citing Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir.1998); *accord* Cushman v. Trans Union Corp., 115 F.3d 220, 226 (1997)).[5]

■■■ Questions involving a party's state of mind are generally appropriately resolved by a jury rather than on summary judgment. *See Thibodeaux v. Rupers*, 196 F.Supp.2d 585, 592 (*citing Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1447 (6th Cir.1993)). From what the Court can ascertain at this point, the following facts are undisputed. Carol Hodges, a former Finance and Insurance Manager for Smith Chevrolet, has testified that the company did not have "written polices" regarding the acquisition of credit reports. She said that salespeople could freely access consumer credit reports. Hodges also said that the company had some unwritten rules for accessing customer credit reports, but these rules were not strictly followed. In fact, Smith Chevrolet's practices were "haphazard" and "very sloppy." Hodges had no part in the February 21, 2001, events and has no idea if Smith Chevrolet acted responsibly the day it accessed Plaintiff's credit report.

Based on these disputed facts, the Court cannot enter summary judgment on the issue of Smith Chevrolet's state of mind and will therefore deny the parties cross motions for summary judgment as they pertain to § 1681n.

## V.

■■■ Last, Smith Chevrolet has moved for summary judgment on Plaintiff's invasion of privacy claim. The Supreme Court of Kentucky adopted the principles for invasion of privacy as enunciated in the Restatement (Second) of Torts (1976) in *McCall v. Courier–Journal and Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky.1981). The key section from that opinion reads as follows:

1. One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

2. The right to privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another . . .; or

(b) appropriation of the other's name or likeness . . .; or

(c) unreasonable publicity given to the other's private life . . ., or

(d) publicity that unreasonably places the other in a false light before the public. . . .'

*Id.*

Of these possibilities, Plaintiff premises his claim on the tort of "unreasonable intrusion upon the seclusion of another."

■■■ Other than summarily adopting intrusion upon seclusion as a cause of action, no Kentucky court in a published opinion has explained in any detail the elements required to meet this standard. This is therefore a question of first impres-

---

**5.** The parties dispute whether the fact that Defendant subjective believed it had a permissible purpose at the time it accessed a consumer report can insulate it from liability under § 1681n. The Court declines to address this argument at this time for two rea- sons. First, the Court does not think the issue is ripe for judgment because very little evidence has been offered. Second, to the extent this is a question of law, it may be more properly cast as defense which Smith Chevrolet should argue for in the jury instructions.

sion in Kentucky and the Court must predict how Kentucky's highest court would decide the issue. *See Davis v. Ford*, 244 F.Supp.2d 784 (W.D.Ky.2003); *Dinsmore Instrument Co. v. Bombardier, Inc.*, 199 F.3d 318, 320 (6th Cir.1999). Because Kentucky has adopted the Restatement version of the tort, Kentucky's highest court would likely adopt the definitions there. According to the Restatement, the standard for "intrusion upon seclusion" is an "intentional intrusion, physical or otherwise, upon the solitude or seclusion of another . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). Thus it appears that, in order to prevail on his claim for intrusion upon seclusion, Plaintiff must show (1) an intentional intrusion by the defendant, (2) into a matter the plaintiff has a right to keep private, (3) which is highly offensive to a reasonable person. Restatement (Second) of Torts § 652B; *see also W. Page Keeton et al., Prosser and Keeton on the Law of Torts* § 117 at 854–56; 62A Am.Jr.2d Privacy § 48 (1990).[6]

██ As to these three elements, Smith Chevrolet does not appear to dispute the second element: Plaintiff had a right to keep his credit report private. The issue, then, is has Plaintiff has raised a question of fact as to whether Smith Chevrolet intentionally invaded Plaintiff's credit report and whether that invasion was highly offensive to a reasonable person? The

Court finds the evidence as to whether Smith Chevrolet *intentionally* violated Plaintiff's privacy is shaky at best. Rather, it appears Smith Chevrolet's actions were more likely negligent or careless. Plaintiff has, however, put forth evidence which, at trial, could show that Smith Chevrolet acted with such reckless disregard for Plaintiff's privacy as to amount to an intentional tort. In the alternative, it may turn out that Smith Chevrolet genuinely thought he was taking actions that were in accordance with the law and therefore the Plaintiff's effort to paint Smith Chevrolet as a reckless, malicious operation will fail. Finally, on these facts, the Court cannot rule as a matter of law that the Smith Chevrolet's actions were not "highly offensive to a reasonable person." The Court will therefore deny Smith Chevrolet's motion for summary judgment as to the intrusion upon seclusion claim.

The Court will enter an order consistent with this Memorandum Opinion.

---

**6.** For other courts applying these three elements, *see e.g., Plaxico v. Michael*, 735 So.2d 1036 (Miss.1999) (relying on the statement but not finding "highly offensive conduct"); *Fields v. Atchison, Topeka, and Santa Fe Ry. Co.*, 985 F.Supp. 1308, 1312 (D.Kan.1997) ("both the manner of intrusion as well as the nature of the information acquired . . . must rise to the level of being highly offensive to the reasonable person"), withdrawn in part, 5 F.Supp.2d 1160 (D.Kan.1998); *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 622 (3rd Cir.1992) (applying Pennsylvania law and citing the Restatement); *Watkins v. United Parcel Service, Inc.*, 797 F.Supp. 1349, 1359–60 (S.D.Miss.1992) (Mississippi law requires conduct "to which a reasonable man would strongly object" and "some bad faith or utterly reckless prying"), aff'd, 979 F.2d 1535 (5th Cir.1992).