RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0085p.06

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————————

NORMAN NORRIS,

            *Plaintiff-Appellant,*

      *v.*

PREMIER INTEGRITY SOLUTIONS, INC.,

            *Defendant-Appellee.*

No. 09-6252

———————————

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 08-00209—John G. Heyburn II, District Judge.

Argued: October 20, 2010

Decided and Filed: April 6, 2011

Before: MOORE, SUTTON, and FRIEDMAN, Circuit Judges.[*]

———————————

## COUNSEL

———————————

**ARGUED:** Gregory A. Belzley, Prospect, Kentucky, for Appellant. Cynthia Blevins Doll, FISHER & PHILLIPS LLP, Louisville, Kentucky, for Appellee. **ON BRIEF:** Gregory A. Belzley, Prospect, Kentucky, Daniel J. Canon, CLAY & ADAMS PLLC, Louisville, Kentucky, for Appellant. Cynthia Blevins Doll, William C. Vail, Jr., FISHER & PHILLIPS LLP, Louisville, Kentucky, for Appellee.

      FRIEDMAN, J., delivered the opinion of the court, in which SUTTON, J., joined. MOORE, J. (pp. 14–18), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

      FRIEDMAN, Circuit Judge. The primary issue in this case is whether the appellee Premier Integrity Solutions Inc. ("Premier") subjected the appellant Norman

———

[*]The Honorable Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

Norris to an unreasonable search in violation of the Fourth Amendment when it required him to provide a urine sample (for a drug testing) while directly facing a Premier employee. Premier used this "direct observation" method for monitoring the provision of the sample because of the ease with which persons giving a sample could otherwise evade the requirement of supplying a valid one. The district court held that Premier's method of obtaining the urine sample did not constitute an unreasonable search in violation of the Fourth Amendment. We affirm.

I

A. Kentucky police arrested Norris and charged him with sexually abusing his stepdaughter. Norris initially was confined in jail for approximately 30 days, and then spent the next six months in house incarceration after posting bond. At that point he was released from confinement under Kentucky's Pretrial Services Monitored Conditional Release Program ("Pretrial Release Program"). Ky. Rev. Stat. Ann. § 431.064. Under that program persons awaiting trial may be freed from mobility restraint upon agreeing to various judicially-imposed conditions. The criminal charges against Norris ultimately were dismissed.

To participate in the Pretrial Release Program, Norris agreed that he would avoid contact with his stepdaughter and not use illegal drugs or consume alcoholic beverages. He also agreed that he would undergo random drug testing.

Premier, a private corporation, conducts pretrial drug testing for the Kentucky courts. Premier uses a "direct observation" method in obtaining urine samples for testing. Premier requires that a male lower his pants so that its employee may "directly observe the urine coming straight out of the body," and must "allow collector visibility of the participants [sic] genitalia." Premier's Executive Vice-President stated that Kentucky judges viewed the direct observation method as "essential", and that the Kentucky Administrative Office of the Courts approved the protocols that described Premier's method of obtaining the samples.

Norris participated in five drug tests Premier conducted, in each of which he provided a urine sample given while directly facing a Premier employee. Prior to the tests, Norris received from Premier a "Notification of Testing Procedures," which he signed and which stated that he would be required to "allow the technician full observation" during the testing.

B. Norris filed suit seeking damages in a Kentucky state court against Premier under 42 U.S.C. § 1983, which Premier removed to the United States District Court for the Western District of Kentucky. He alleged that Premier, acting under color of state law, had violated his rights under the Fourth Amendment. He contended that Premier's "direct observation" method of drug testing constituted an unreasonable search and also violated state law.

On cross motions for summary judgment, the district court granted Premier's motion and dismissed the suit. It held that Premier's "direct observation" method of obtaining a urine sample was a reasonable search and therefore did not violate Norris's rights under the Fourth Amendment. *Norris v. Premier Integrity Solutions, Inc.*, No. 3:08CV00209(JGH), 2009 WL 3334900 at *1 (W.D. Ky. Oct. 15, 2009).

Noting that Norris' "complaint only alleges constitutional violations because of the *method* of collection, not the *fact* of collection[,]" the district court applied the "balancing test" for determining the reasonableness of a search under the Fourth Amendment. *Id.* at *2. The court held that Norris, as a pre-trial detainee who had consented to drug testing, had a diminished expectation of privacy. It described Premier's "direct observation method" as "highly intrusive," but ruled that Premier's "actions do not intrude significantly or unreasonably on Plaintiff's expectations of privacy." *Id.* at *2-3, *6. The court held that the government had a "compelling" interest in using the "direct observation" method, which was utilized "to prevent cheating on drug tests"; it noted that Premier "has presented significant evidence that direct observation is the best, and potentially the only, method for preventing all forms of cheating drug tests." *Id.* at *3-4. The court had

little difficulty concluding that direct observation furthers the government's interest in effective drug testing. If the government's interest in conducting the tests is sufficient to allow testing in the first place, certainly the government has a valid interest in ensuring that those tests produce valid and reliable results. If the tests are ineffective, the government's legitimate purposes, such as ensuring pretrial releasees show up for trial, ensuring that no crimes are committed during pretrial release and protecting the public, would be completely thwarted. Given Plaintiff's diminished expectation of privacy based upon alleged prior misconduct and circumstances and the government's compelling interest in ensuring the validity of the testing, the Court finds that the direct observation method of urine collection was reasonable despite its highly intrusive nature.

*Id.* at *5 (internal citation omitted).

## II

Premier makes a preliminary contention that requires little discussion. It argues that as a private party, it was not acting under color of state law, and therefore could not violate Section 1983. The district court assumed without deciding that Premier was acting under color of state law because of the state's involvement with the drug testing. *Norris*, 2009 WL 3334900 at *1 n.2.

A private party will be deemed a state actor if there is a "sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself," *Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776, 784 (6th Cir. 2007) (internal citation omitted), or the private party's action is "entwined with governmental policies." *Brentwood Acad. v. Tenn. Secondary Sch.*, 531 U.S. 288, 296 (2001) (internal citations omitted). Premier conducted the tests for the government after the Administrative Office of the Courts had approved Premier's policies and methods. Premier's Executive Vice President stated that judges in Kentucky viewed the direct observation testing method as "essential." The relationship between the state and Premier in conducting the tests established that Premier acted under color of state law.

III

A.  The Fourth Amendment protects "the people . . . against unreasonable searches and seizures."  The Supreme Court has held that "state-compelled collection and testing of urine . . . constitutes a 'search' subject to the demands of the Fourth Amendment."  *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989)).  The question here is whether Premier's search of Norris by requiring him to provide a urine sample under its "direct observation" method was reasonable.

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant," which, in turn, ordinarily requires a "showing of probable cause." *Vernonia*, 515 U.S. at 653.  "A  search unsupported by probable cause can be constitutional," however, "'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"  *Id.* (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).  The Supreme Court has applied the "special needs" doctrine to permit suspicionless searches involving the provision of urine samples. *Id.*

B.  Before both the district court and this court Norris stated that he does not challenge Premier's right to require him to provide a urine sample, but only the way in which it obtained the sample from him.  In the district court he stated: "Let it be clear: Plaintiff does not complain . . . that he was tested for drugs.  The sole issue in this case is whether the *manner* in which Defendant has chosen to conduct drug-testing" is constitutional.  Even if the requirement that Norris submit to random drug testing as a condition of participating in the state's Pretrial Release Program could be viewed as part of a law enforcement program - which seems dubious - the special needs doctrine governs in determining the reasonableness of Premier's "direct observation" method of obtaining the sample which, as noted, is the only issue Norris presents.

The use of that method involves a matter of judicial administration, not law enforcement.  The Kentucky court was attempting to determine whether Norris was

complying with a critical condition of his participation in the Pretrial Release Program, namely, that he not use narcotic drugs while on pretrial release. Premier's use of the "direct observation" method of obtaining a urine sample was not part of routine law enforcement, which the Supreme Court described in this context as "to discover evidence of criminal wrongdoing." *Vernonia*, 515 U.S. at 653. The purpose was to aid it in determining whether Norris was complying with the terms and conditions of his participation in the Pretrial Release Program.

C. In determining the reasonableness of Premier's search of Norris by using its "direct observation" method of obtaining a urine sample, we evaluate and balance three factors: "the nature of the privacy interest upon which the search here at issue intrudes," "the character of the intrusion that is complained of," and "the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it." *Vernonia*, 515 U.S. at 654, 658, 660; *see also Bd. of Educ. of Indep. School Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 830-34 (2002).

1. Although "urine tests are not invasive of the body," *Skinner*, 489 U.S. at 626, "urinalysis intrudes upon 'an excretory function traditionally shielded by great privacy.'" *Vernonia*, 515 U.S. at 658 (quoting *Skinner*, 489 U.S. at 626). Here, however, Norris' expectations of privacy were reduced for two related reasons. First, Norris agreed to random drug testing as a condition of his pretrial release. Although in so doing Norris may not have been aware that such testing would involve Premier's "direct observation" method of obtaining a urine sample, he must have known that he would be required to give a urine sample. Indeed, Norris was told prior to the testing that the sample collector would require "full observation" during the collection. Norris' consent to random drug testing itself diminished his expectation of privacy. *United States v. Knights*, 534 U.S. 112, 118-120 (2001); *see also Samson v. California*, 547 U.S. 843, 852 (2006); *United States v. Scott*, 450 F.3d 863, 873 (9th Cir. 2006) (noting that one on pretrial release had a "reduced expectation of privacy" after signing a consent to random drug testing); *Wilcher v. City of Wilmington*, 139 F.3d 366, 374 (3d Cir. 1998) (firefighters who agreed to random drug testing had a diminished expectation of privacy).

Second, Norris' participation in the Pretrial Release Program itself diminished his expectation of privacy. A major aim of the Program is to insure that its participants will appear at trial. To achieve that objective, the Program subjects them to various conditions and limitations, including the prohibition on using narcotic drugs and consuming alcoholic beverages. Just as railroad employees had a reduced expectation of privacy because they worked in a highly regulated field and were validly subjected to drug testing through urinalysis in certain circumstances, *Skinner*, 489 U.S. at 627, so Norris' participation in the highly government controlled and regulated Pretrial Release Program reduced his expectation of privacy.

2. As the district court recognized, Premier's "direct observation" method of obtaining a urine sample is "highly intrusive." *Norris,* 2009 WL 3334900 at *3. The Supreme Court, however, has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *City of Ontario v. Quon*, - - - U.S. - - -, 130 S. Ct. 2619, 2632 (2010) (quoting *Vernonia*, 515 U.S. at 663). The intrusiveness of Premier's action is but one of the factors to be weighed and balanced in determining the reasonableness of the search.

3. The district court stated that the government's "interest in using direct observation is quite simple: to prevent cheating on drug tests." *Norris*, 2009 WL 3334900 at *3. The court was "persuaded by the evidence adduced by Defendant that direct observation is the best method of preventing and detecting cheating." *Id.* at *5. The record fully supports these conclusions. It includes a 2009 detailed written expert report by Dr. Kadehjian, a bio-medical consultant. Based on various specified materials he had reviewed, Dr. Kadehjian concluded that "direct observation of urine specimen collection is a critical component for effective and reliable urine drug testing to identify drug use." He explained:

> It is well-recognized and documented that individuals subject to drug testing programs have made efforts both before and during urine specimen collections in an attempt to thwart the effectiveness of urine drug testing through various forms of specimen manipulation. These donor efforts include urine specimen dilution, adulteration, and substitution. Each of these are described in more detail below.

Awareness of the growing problem of these donor efforts has led to both state and federal regulatory and legislative initiatives to ensure the integrity of urine specimen collection and the effectiveness of drug testing procedures to identify drug use.

After describing in some detail the three methods that have been used to avoid and evade effective testing - "dilution of a urine specimen," "adulteration", i.e., "the addition of chemicals to a urine specimen in an effort to either prevent test methods from functioning properly or to attempt to break down drugs which would otherwise be detectable," and "substitution" - "the provision of a urine specimen that is not directly from the donor's body," Dr. Kadehjian concluded that

The opportunity for donors to thwart the effectiveness of urine drug testing is well-recognized and has led to the development and implementation of numerous procedural safeguards. . . . However, specimen validity testing alone is not effective at deterring or detecting all efforts at specimen dilution, adulteration or substitution. The most effective procedural safeguard is the use of direct observation of urine specimen collection. Without the use of direct observation, the identity and integrity of the provided specimen may be in question.

The record also contains a transcript of 2007 testimony by a federal official (the Government Accountability Office's Managing Director of Forensic Audits and Special Investigations) before a House of Representatives hearing, which reported that the Department of Transportation "drug testing program is vulnerable to manipulation by drug users, especially given the wide availability of products designed to defeat drug tests." The testimony described in detail the various methods and products that are available, including on the internet, to falsify and evade the supplying of valid urine samples.

D. Weighing and balancing these factors, we reach the same conclusion that the district court did: the search of Norris that resulted from Premier's use of the direct observation method of obtaining a urine sample was a reasonable one and therefore did not violate the Fourth Amendment. Although the search undoubtedly was highly intrusive, Norris had a significantly reduced expectation of privacy because he was on pre-trial release awaiting criminal prosecution and, as a condition of such release, had

agreed that he would undergo drug testing.  The government had a strong-indeed, a compelling-interest in insuring the accuracy of the drug testing by preventing Norris from giving a false specimen.  As the district court stated, "[i]f the government's interest in conducting the tests is sufficient to allow testing in the first place, certainly the government has a valid interest in ensuring that those tests produce valid and reliable results."  *Norris*, 2009 WL 3334900 at *5.  The record shows that it is easy and widespread for people providing urine for drug testing to substitute false or inaccurate specimens and that only the direct observation method of obtaining such samples is fully effective "to prevent cheating on drug tests," in the language of the district court.  Neither the Kentucky authorities nor Premier acted improperly in requiring that method.

Our disagreement with the dissent relates primarily to the weight to be given to those factors in determining whether the search was reasonable.  We give greater weight than the dissent does to the state's strong interest in providing an accurate urine sample and to Norris' significantly reduced expectation of privacy in the circumstances.

Norris contends, however, that before Premier could use the direct observation method, it had to have a reasonable suspicion that Norris was likely to cheat on the urine test.  But the cases Norris cites for this proposition, all older ones, specifically concluded that less-intrusive methods were adequate to monitor the testing.  This is no longer the situation.  The Supreme Court has never required individualized suspicion in order to conduct urinalysis.  *See Vernonia*, 515 U.S. at 664; *Skinner*, 489 U.S. at 624.  Because the ability to evade or falsify testing has increased, more stringent monitoring procedures are now necessary and therefore reasonable.

Norris also contends that the direct observation method violated his Fourth Amendment rights because it was a "visual strip search."  But however one describes the search, the balancing inquiry under the Fourth Amendment remains the same.  *See BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 208 (D.C. Cir. 2009) (citing *Bell v. Wolfish*, 441 U.S. 520, 559-60 (1979)).

*United States v. Scott*, 450 F.3d 863 (9th Cir. 2006), upon which Norris seemingly relies, does not support his claim.  There the Ninth Circuit held that the police

could not require someone accused of crime to agree, as a condition of pretrial release, to submit to random drug testing. The court held that because the government did not have probable cause to believe that the individual was using drugs, it could not impose that requirement as a condition of pretrial release. *Id.* at 872. In so holding, the court rejected the government's claim that "the search regime to which Scott was subjected was necessary to ensure his appearance at trial." *Id.* at 871. In essence, the Ninth Circuit held that in the circumstances there presented, the police required probable cause before they could thus search someone on pretrial release.

Norris, however, has disclaimed any challenge to the validity of Kentucky's policy of conditioning pretrial release upon consent to random drug testing. We cannot say how the Ninth Circuit would react to the narrower question we here decide, relating only to the method that Premier used in conducting the test.

E. Our conclusion accords with that of the other federal court of appeals that most recently considered and upheld the validity under the Fourth Amendment of the direct observation method of obtaining urine samples. In *BNSF*, the District of Columbia Circuit upheld, against challenges under the Fourth Amendment and the Administrative Procedures Act, a federal regulation that required employees in certain public transportation industries who had failed or refused to take a drug test to pass a series of drug tests "conducted under direct observation" before "performing any safety-sensitive duties." 566 F.3d at 202. In "find[ing] the challenged regulation facially valid under the Fourth Amendment," *id.* at 208, the court characterized the "government's interest in transportation safety" as "compelling." *Id.* at 206. It ruled that "[g]iven the proliferation of cheating devices, we have little difficulty concluding that direct observation furthers the government's interest in effective drug testing," and that the "government thus has a strong interest in conducting direct observation testing to ensure transportation safety." *Id.* Balancing the governmental interest against the "extremely invasive" nature of direct observation, the court stated:

> [T]he Department has reasonably concluded that the proliferation of cheating devices makes direct observation necessary to render these drug tests - needed to protect the traveling public from lethal hazards -

effective.  Weighing these factors, we strike the balance in favor of permitting direct observation testing in these circumstances.

*Id.* at 208.

The court distinguished its earlier decision in *NTEU v. Yeutter*, 918 F.2d 968 (D.C. Cir. 1990), which had held unconstitutional a regulation requiring the direct observation method of obtaining a urine sample for drug testing that "rested on reasonable suspicion of drug use but no suspicion of cheating," because the record in that case indicated that less evasive testing procedures "were adequate to detect cheating." *BNSF*, 566 F.3d at 208.  The *BNSF* court concluded:

> Given the proliferation of such cheating devices, here we have a very different record, one that fully supports the Department's finding that standard monitoring procedures are inadequate.  We thus conclude that here, unlike in *Yeutter*, direct observation testing will "significantly improve testing accuracy."

*Id.* (internal citation omitted).

Although there are factual distinctions between the present case and *BNSF*, the basic rationale of *BNSF* - that "the proliferation of cheating devices makes direct observation necessary to render these drug tests . . . effective," *id.*-is equally applicable here.

## IV

In view of our holding that Premier's direct observation method was not an unreasonable search under the Fourth Amendment, we need not consider Premier's contention that it had qualified immunity for its action

## V

Norris here repeats two of the four state law claims he unsuccessfully argued in the district court.  He contends that Premier's use of the direct observation method of obtaining a urine sample constituted (A) an illegal invasion of his privacy by "intrusion

upon the seclusion of another," and (B) the intentional infliction of emotional distress. The district court correctly granted summary judgment dismissing those claims.

A.   In *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981), the Supreme Court of Kentucky adopted the Restatement (Second) of Torts (1976) definition of the general tort of invasion of privacy.  *Id.* at 887.  *McCall* dealt only with the specific tort of placing another in "false light."   Because the Supreme Court of Kentucky had not yet addressed the tort of "intrusion upon seclusion of another," the District Court for the Western District of Kentucky presumed that the Kentucky Supreme Court also would adopt the definition of that tort in the Restatement (Second).  *See Smith v. Bob Smith Chevrolet*, *Inc.*, 275 F. Supp. 2d 808, 821-22 (W.D. Ky. 2003).  We have no reason to disagree with that approach, and therefore apply it here.

To establish intrusion upon seclusion, Norris would have to show   "(1) an intentional intrusion by the defendant, (2) into a matter the plaintiff has a right to keep private, (3) which is highly offensive to a reasonable person."   *Id.* at 822 (citing Restatement (Second) of Torts § 652B).  We have concluded, however, that the direct observation method used here was reasonable under the Fourth Amendment.  As the district court noted, it would "defy logic" to now hold that Norris had a "right to keep [the same act] private." *Norris*, 2009 WL 3334900 at *5.

B.   To establish the tort of intentional infliction of emotional distress in Kentucky, the plaintiff must establish that the defendant's conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."   *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789 (Ky. 2004) (quoting Restatement (Second) of Torts § 46(1)). Once again, our holding that Premier's direct observation method of obtaining a urine sample was a reasonable search under the Fourth Amendment establishes that the conduct did not "go beyond all possible bounds of decency" and would not be regarded as "atrocious" or as "intolerable in a civilized community."

CONCLUSION

The district court's judgment granting summary judgment for Premier is affirmed.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. Kentucky conducts drug tests on pretrial releasees to increase the likelihood that they will appear at later court proceedings. When conducting the drug tests, Kentucky uses "direct observation" to attain the highest security against adulteration of urine samples. While efficacious, this method is highly invasive: testing supervisors are "required to directly observe the urine coming straight out of the body." R. 24-4 (Procedures ¶ 14). Participants are "required to lower their pants below their knees. Long, baggy shirts must be raised enough to allow collector visibility of the participant[']s genitalia. The participant must face the collector for full view and not a side view." *Id.*

While conceding that the Fourth Amendment permits drug testing of pretrial releasees, Norris objects to this invasive method of conducting drug tests. Norris has no known history of drug use. He was not charged with a drug crime. At the time of his drug tests, his guilt had not been adjudicated for any crime. And because he was awaiting trial, he had little choice but to sign off on whatever conditions of release Kentucky offered. Based on these facts, I disagree with how the majority balances Norris's privacy interest, the extent of the intrusion, and the government's interest. I would reverse the district court's grant of summary judgment on the Fourth Amendment claim and, derivatively, the intrusion-upon-seclusion privacy claim.

## I. NORRIS'S PRIVACY INTEREST

The majority reasons that, by consenting to provide a urine sample, Norris lessened his expectation of privacy. That logic would explain why Norris did not have a privacy interest in his urine sample, and he does not assert that interest. However, it does not explain how Norris's consent diminished his privacy interest as it relates to the *method* of drug testing. Consent to a result does not entail consent to the most intrusive method of achieving that result. The fact that Norris might have known that the drug testing would involve "full observation" does little to clarify the issue. Courts have used

similar language to describe methods that are meaningfully less invasive than what Norris endured. *See Wilcher v. City of Wilmington*, 139 F.3d 366, 376-77 (3d Cir. 1998) (upholding "direct observation" urine testing, in which monitors, who "observe[d] only the collection process generally and not the particular individual's genitalia," stood behind the male firefighters and to the side of the female firefighters).

More importantly, even if Norris knew the drug-testing protocol in advance, the majority overstates the degree to which Norris's participation in pretrial release diminished his expectation of privacy. The majority cites four cases for that proposition. In one, *United States v. Scott*, the court found that the infringement of the pretrial releasee's privacy was so great that it rendered suspicionless drug testing unconstitutional. 450 F.3d 863, 873–74 (9th Cir. 2006). The challengers to government searches in both Supreme Court cases on which the majority relies, *United States v. Knights*, 534 U.S. 112, 118–20 (2001), and *Samson v. California*, 547 U.S. 843, 852 (2006), had been convicted of crimes and were on probation and parole, respectively. The final case that the majority cites, *Wilcher*, 139 F.3d at 374, involved firefighters who chose their employment. Prior adjudication of guilt and voluntary employment both serve as "safeguards limiting the extent to which induced or coerced consent could threaten privacy and liberty interests." *Criminal Law — Fourth Amendment — Ninth Circuit Holds that Search of Pretrial Releasee Is Unconstitutional Despite Releasee's Consent*, 119 HARV. L. REV. 1630, 1635–36 (2006). Prior adjudication of guilt provides a constitutionally relevant distinction, judged in a proceeding that affords due process, on which to base the deprivation of constitutional rights. Voluntary employment signals bargaining power to negotiate or refuse conditions of employment.

Pretrial releasees lack comparable safeguards from Fourth Amendment violations. Faced with even more stringently regulated alternatives, such as jail pending trial, pretrial release is the preferable option, even if its conditions are objectively unreasonable. *Cf. Samson*, 547 U.S. at 863 n.4 (Stevens, J., dissenting) ("Whether or not a prisoner can choose to remain in prison rather than be released on parole, he has no 'choice' concerning the search condition; he may either remain in prison, where he will

be subjected to suspicionless searches, or he may exit prison and still be subject to suspicionless searches.  Accordingly, to speak of consent in this context is to resort to a manifest fiction, for the [parolee] who purportedly waives his rights by accepting such a condition has little genuine option to refuse." (internal quotation and citation omitted)).  By arguing that pretrial release is a highly regulated program that should have diminished Norris's expectation of privacy, the majority begs the question of what regulations are constitutionally permissible.  I would not extend *Samson* to cover pretrial releasees whose guilt has not been adjudicated, and I would conclude that Norris retains a strong privacy interest.

## II.  INTRUSION

The majority concedes that "Premier's 'direct observation' method of obtaining a urine sample is 'highly intrusive.'"  Maj. Op. at 7 (citing *Norris v. Premier Integrity Solutions*, No. 3:08-CV-209-H, 2009 WL 3334900, at *3 (W.D. Ky. Oct. 15, 2009)).  Urine tests "require [subjects] to perform an excretory function traditionally shielded by great privacy." *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 626 (1989).  The extent of intrusion "depends upon the manner in which production of the urine sample is monitored." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658 (1995).  Several cases that have upheld urine tests contrasted their facts to the direct observation that Norris endured.  For example, in *Skinner*, the court noted that "[t]he regulations do not require that samples be furnished under the direct observation of a monitor."  489 U.S. at 626; *see also Veronia*, 515 U.S. at 658 (upholding conditions "nearly identical to those typically encountered in public restrooms," in which males "remain[ed] fully clothed" and were "only observed from behind, if at all," while females used "an enclosed stall" as a monitor "listen[ed] only for sounds of tampering"); *Wilcher*, 139 F.3d at 376–77.  The intrusiveness of direct-observation testing weighs heavily in Norris's favor.

## III.  KENTUCKY'S INTEREST

The majority explains that Kentucky has an interest in preventing pretrial releasees from cheating on drug tests.  "'[I]f the government's interest in conducting the tests is sufficient to allow testing in the first place, certainly the government has a valid interest in ensuring that those tests produce valid and reliable results.'"  Maj. Op. at 9 (quoting *Norris*, 2009 WL 3334900, at *5).[1]  However, the government's interest in incrementally greater accuracy is not compelling.  The government has no reason to suspect that Norris and others like him, who have never been accused of a drug offense, will falsify a drug test.  That difference is reflected in the case on which the majority relies, *BNSF Railway Co. v. U.S. Department of Transportation*, 566 F.3d 200 (D.C. Cir. 2009).  In *BNSF*, the challengers to the drug-testing protocol were public-transit employees engaged in "safety-sensitive duties" and *had failed or refused a past drug test*. *Id.* at 202.  Norris has no similar history.  Individualized suspicion is not required for special-needs searches, but as the suspicion of wrongdoing among a category of people becomes more slight, the government's interest wanes.

A more closely analogous case is *Scott*, in which the Ninth Circuit held that the government may not drug test pretrial releasees under either a special-needs approach or the more general totality-of-the-circumstances test.  450 F.3d at 868–75.  When considering the government's interest, the court found that "the connection between the object of the [drug] test (drug use) and the harm to be avoided (nonappearance in court) is tenuous. . . . [T]he government has produced nothing to suggest [that failure to appear is a] common enough problem[] to justify intruding on the privacy rights of every single defendant out on pretrial release." *Id.* at 870.  The majority opinion distinguishes *Scott* by arguing that Scott challenged the constitutionality of drug testing pretrial releasees regardless of method.  But that distinction *strengthens* Norris's claim.  The privacy interest that Norris has asserted is more narrow than Scott's, and the government's

---

[1]This logic must apply only to the identification of a valid interest, not the conclusion that the interest renders the government's action reasonable under the Fourth Amendment.  Otherwise, the government could put forward a constitutionally adequate interest and procedure, substitute a far more egregious procedure that slightly enhances reliability, and be exempt from Fourth Amendment challenges to that egregious procedure.

interest conflicts less: even if Norris succeeds in his suit, Kentucky can still drug test pretrial releasees using alternative procedures that better protect privacy. Even crediting Kentucky with a greater interest in ensuring appearance at trial than the federal government produced in *Scott*, *see* KY. REV. STAT. ANN. § 431.064(2)(e) (permitting "[a]n order prohibiting [pretrial releasees] from possession or consumption of alcohol or controlled substances" "to ensure the[ir] appearance . . . at a subsequent court proceeding"), Kentucky's interest in the *added* protection that direct observation affords is not overpowering.

## IV. CONCLUSION

The crux of the majority's analysis is that, "[b]ecause the ability to evade or falsify testing has increased, more stringent monitoring procedures are now necessary and therefore reasonable." Maj. Op. at 9. Premier has documented abundant methods for cheating on drug tests. But the possibility of cheating should not justify every precaution that the state deems efficacious. By reaching the opposite conclusion, the majority unravels Fourth Amendment protections for pretrial releasees.

Kentucky has no reason to believe that suspects in non-drug-related crimes with no history of drug use will use drugs while on pretrial release. The risk that they will, nevertheless, falsify drug tests is too attenuated to impose the added protection—and incumbent privacy intrusion—of direct-observation testing. Therefore, in my view, the ability to evade or falsify testing does not strengthen the government's interest sufficiently to overcome Norris's expectation of privacy given the extremely intrusive nature of the search. I would reverse the district court's grant of summary judgment on the Fourth Amendment and intrusion-upon-seclusion privacy claim.