FRIEDMAN, J., delivered the opinion of the court, in which SUTTON, J., joined. MOORE, J. (pp. 703-06), delivered a separate dissenting opinion.
OPINION
FRIEDMAN, Circuit Judge.
The primary issue in this case is whether the appellee Premier Integrity Solutions Inc. (“Premier”) subjected the appellant Norman Norris to an unreasonable search in violation of the Fourth Amendment when it required him to provide a urine sample (for a drug testing) while directly facing a Premier employee. Premier used this “direct observation” method for monitoring the provision of the sample because of the ease with which persons giving a sample could otherwise evade the requirement of supplying a valid one. The district court held that Premier’s method of obtaining the urine sample did not constitute an unreasonable search in violation of the Fourth Amendment. We affirm.
I
A. Kentucky police arrested Norris and charged him with sexually abusing his stepdaughter. Norris initially was confined in jail for approximately 30 days, and then spent the next six months in house incarceration after posting bond. At that point he was released from confinement under Kentucky’s Pretrial Services Monitored Conditional Release Program (“Pretrial Release Program”). Ky.Rev.Stat. Ann. § 431.064. Under that program persons awaiting trial may be freed from mobility restraint upon agreeing to various judicially-imposed conditions. The criminal charges against Norris ultimately were dismissed.
To participate in the Pretrial Release Program, Norris agreed that he would avoid contact with his stepdaughter and not use illegal drugs or consume alcoholic beverages. He also agreed that he would undergo random drug testing.
Premier, a private corporation, conducts pretrial drug testing for the Kentucky courts. Premier uses a “direct observation” method in obtaining urine samples for testing. Premier requires that a male lower his pants so that its employee may “directly observe the urine coming straight out of the body,” and must “allow collector visibility of the participants [sic] genitalia.” Premier’s Executive Vice-President stated that Kentucky judges viewed the direct *697 observation method as “essential”, and that the Kentucky Administrative Office of the Courts approved the protocols that described Premier’s method of obtaining the samples.
Norris participated in five drug tests Premier conducted, in each of which he provided a urine sample given while directly facing a Premier employee. Prior to the tests, Norris received from Premier a “Notification of Testing Procedures,” which he signed and which stated that he would be required to “allow the technician full observation” during the testing.
B. Norris filed suit seeking damages in a Kentucky state court against Premier under 42 U.S.C. § 1983, which Premier removed to the United States District Court for the Western District of Kentucky. He alleged that Premier, acting under color of state law, had violated his rights under the Fourth Amendment. He contended that Premier’s “direct observation” method of drug testing constituted an unreasonable search and also violated state law.
On cross motions for summary judgment, the district court granted Premier’s motion and dismissed the suit. It held that Premier’s “direct observation” method of obtaining a urine sample was a reasonable search and therefore did not violate Norris’s rights under the Fourth Amendment. Norris v. Premier Integrity Solutions, Inc., No. 3:08CV00209(H), 2009 WL 3334900 at *1 (W.D.Ky. Oct. 15, 2009).
Noting that Norris’ “complaint only alleges constitutional violations because of the method of collection, not the fact of colleetion[,]” the district court applied the “balancing test” for determining the reasonableness of a search under the Fourth Amendment. Id. at *2. The court held that Norris, as a pre-trial detainee who had consented to drug testing, had a diminished expectation of privacy. It described Premier’s “direct observation method” as “highly intrusive,” but ruled that Premier’s “actions do not intrude significantly or unreasonably on Plaintiffs expectations of privacy.” Id. at *2-3, *6. The court held that the government had a “compelling” interest in using the “direct observation” method, which was utilized “to prevent cheating on drug tests”; it noted that Premier “has presented significant evidence that direct observation is the best, and potentially the only, method for preventing all forms of cheating drug tests.” Id. at *3-4. The court had
little difficulty concluding that direct observation furthers the government’s interest in effective drug testing. If the government’s interest in conducting the tests is sufficient to allow testing in the first place, certainly the government has a valid interest in ensuring that those tests produce valid and reliable results. If the tests are ineffective, the government’s legitimate purposes, such as ensuring pretrial releasees show up for trial, ensuring that no crimes are committed during pretrial release and protecting the public, would be completely thwarted. Given Plaintiffs diminished expectation of privacy based upon alleged prior misconduct and circumstances and the government’s compelling interest in ensuring the validity of the testing, the Court finds that the direct observation method of urine collection was reasonable despite its highly intrusive nature.
Id. at *5 (internal citation omitted).
II
Premier makes a preliminary contention that requires little discussion. It argues that as a private party, it was not acting under color of state law, and therefore could not violate Section 1983. The district court assumed without deciding that *698 Premier was acting under color of state law because of the state’s involvement with the drug testing. Norris, 2009 WL 3334900 at *1 n. 2.
A private party will be deemed a state actor if there is a “sufficiently close nexus between the government and the private party’s conduct so that the conduct may be fairly attributed to the state itself,” Campbell v. PMI Food Equipment Group, Inc., 509 F.3d 776, 784 (6th Cir.2007) (internal citation omitted), or the private party’s action is “entwined with governmental policies.” Brentwood Acad. v. Tenn. Secondary Sch., 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (internal citations omitted). Premier conducted the tests for the government after the Administrative Office of the Courts had approved Premier’s policies and methods. Premier’s Executive Vice President stated that judges in Kentucky viewed the direct observation testing method as “essential.” The relationship between the state and Premier in conducting the tests established that Premier acted under color of state law.
Ill
A. The Fourth Amendment protects “the people ... against unreasonable searches and seizures.” The Supreme Court has held that “state-compelled collection and testing of urine ... constitutes a ‘search’ subject to the demands of the Fourth Amendment.” Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (citing Skinner v. Ry. Labor Executives’ Ass’n, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). The question here is whether Premier’s search of Norris by requiring him to provide a urine sample under its “direct observation” method was reasonable.
“Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing ... reasonableness generally requires the obtaining of a judicial warrant,” which, in turn, ordinarily requires a “showing of probable cause.” Vernonia, 515 U.S. at 653, 115 S.Ct. 2386. “A search unsupported by probable cause can be constitutional,” however, “ ‘when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.’ ” Id. (quoting Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). The Supreme Court has applied the “special needs” doctrine to permit suspicionless searches involving the provision of urine samples. Id.
B. Before both the district court and this court Norris stated that he does not challenge Premier’s right to require him to provide a urine sample, but only the way in which it obtained the sample from him. In the district court he stated: “Let it be clear: Plaintiff does not complain ... that he was tested for drugs. The sole issue in this case is whether the manner in which Defendant has chosen to conduct drug-testing” is constitutional. Even if the requirement that Norris submit to random drug testing as a condition of participating in the state’s Pretrial Release Program could be viewed as part of a law enforcement program — which seems dubious — the special needs doctrine governs in determining the reasonableness of Premier’s “direct observation” method of obtaining the sample which, as noted, is the only issue Norris presents.
The use of that method involves a matter of judicial administration, not law enforcement. The Kentucky court was attempting to determine whether Norris was complying with a critical condition of his participation in the Pretrial Release Program, namely, that he not use .narcotic *699 drugs while on pretrial release. Premier’s use of the “direct observation” method of obtaining a urine sample was not part of routine law enforcement, which the Supreme Court described in this context as “to discover evidence of criminal wrongdoing.” Vernonia, 515 U.S. at 653, 115 S.Ct. 2386. The purpose was to aid it in determining whether Norris was complying with the terms and conditions of his participation in the Pretrial Release Program.
C. In determining the reasonableness of Premier’s search of Norris by using its “direct observation” method of obtaining a urine sample, we evaluate and balance three factors: “the nature of the privacy interest upon which the search here at issue intrudes,” “the character of the intrusion that is complained of,” and “the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it.” Vernonia, 515 U.S. at 654, 658, 660, 115 S.Ct. 2386; see also Bd. of Educ. of Indep. School Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 830-34, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002).
1. Although “urine tests are not invasive of the body,” Skinner, 489 U.S. at 626, 109 S.Ct. 1402, “urinalysis intrudes upon ‘an excretory function traditionally shielded by great privacy.’ ” Vemonia, 515 U.S. at 658, 115 S.Ct. 2386 (quoting Skinner, 489 U.S. at 626, 109 S.Ct. 1402). Here, however, Norris’ expectations of privacy were reduced for two related reasons. First, Norris agreed to random drug testing as a condition of his pretrial release. Although in so doing Norris may not have been aware that such testing would involve Premier’s “direct observation” method of obtaining a urine sample, he must have known that he would be required to give a urine sample. Indeed, Norris was told prior to the testing that the sample collector would require “full observation” during the collection. Norris’ consent to random drug testing itself diminished his expectation of privacy. United States v. Knights, 534 U.S. 112, 118-120, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); see also Samson v. California, 547 U.S. 843, 852, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); United States v. Scott, 450 F.3d 863, 873 (9th Cir.2006) (noting that one on pretrial release had a “reduced expectation of privacy” after signing a consent to random drug testing); Wilcher v. City of Wilmington, 139 F.3d 366, 374 (3d Cir.1998) (firefighters who agreed to random drug testing had a diminished expectation of privacy).
Second, Norris’ participation in the Pretrial Release Program itself diminished his expectation of privacy. A major aim of the Program is to insure that its participants will appear at trial. To achieve that objective, the Program subjects them to various conditions and limitations, including the prohibition on using narcotic drugs and consuming alcoholic beverages. Just as railroad employees had a reduced expectation of privacy because they worked in a highly regulated field and were validly subjected to drug testing through urinalysis in certain circumstances, Skinner, 489 U.S. at 627, 109 S.Ct. 1402, so Norris’ participation in the highly government controlled and regulated Pretrial Release Program reduced his expectation of privacy.
2. As the district court recognized, Premier’s “direct observation” method of obtaining a urine sample is “highly intrusive.” Norris, 2009 WL 3334900 at *3. The Supreme Court, however, has “repeatedly refused to declare that only the ‘least intrusive’ search practicable can be reasonable under the Fourth Amendment.” City of Ontario v. Quon, — U.S. -, 130 S.Ct. 2619, 2632, 177 L.Ed.2d 216 (2010) (quoting Vernonia, 515 U.S. at 663, 115 S.Ct. 2386). The intrusiveness of Pre *700 mier’s action is but one of the factors to be weighed and balanced in determining the reasonableness of the search.
3. The district court stated that the government’s “interest in using direct observation is quite simple: to prevent cheating on drug tests.” Norris, 2009 WL 3334900 at *3. The court was “persuaded by the evidence adduced by Defendant that direct observation is the best method of preventing and detecting cheating.” Id. at *5. The record fully supports these conclusions. It includes a 2009 detailed written expert report by Dr. Kadehjian, a bio-medical consultant. Based on various specified materials he had reviewed, Dr. Kadehjian concluded that “direct observation of urine specimen collection is a critical component for effective and reliable urine drug testing to identify drug use.” He explained:
It is well-recognized and documented that individuals subject to drug testing programs have made efforts both before and during urine specimen collections in an attempt to thwart the effectiveness of urine drug testing through various forms of specimen manipulation. These donor efforts include urine specimen dilution, adulteration, and substitution. Each of these are described in more detail below.
Awareness of the growing problem of these donor efforts has led to both state and federal regulatory and legislative initiatives to ensure the integrity of urine specimen collection and the effectiveness of drug testing procedures to identify drug use.
After describing in some detail the three methods that have been used to avoid and evade effective testing — “dilution of a urine specimen,” “adulteration”, i.e., “the addition of chemicals to a urine specimen in an effort to either prevent test methods from functioning properly or to attempt to break down drugs which would otherwise be detectable,” and “substitution” — “the provision of a urine specimen that is not directly from the donor’s body,” Dr. Kadehjian concluded that
The opportunity for donors to thwart the effectiveness of urine drug testing is well-recognized and has led to the development and implementation of numerous procedural safeguards.... However, specimen validity testing alone is not effective at deterring or detecting all efforts at specimen dilution, adulteration or substitution. The most effective procedural safeguard is the use of direct observation of urine specimen collection. Without the use of direct observation, the identity and integrity of the provided specimen may be in question.
The record also contains a transcript of 2007 testimony by a federal official (the Government Accountability Office’s Managing Director of Forensic Audits and Special Investigations) before a House of Representatives hearing, which reported that the Department of Transportation “drug testing program is vulnerable to manipulation by drug users, especially given the wide availability of products designed to defeat drug tests.” The testimony described in detail the various methods and products that are available, including on the internet, to falsify and evade the supplying of valid urine samples.
D. Weighing and balancing these factors, we reach the same conclusion that the district court did: the search of Norris that resulted from Premier’s use of the direct observation method of obtaining a urine sample was a reasonable one and therefore did not violate the Fourth Amendment. Although the search undoubtedly was highly intrusive, Norris had a significantly reduced expectation of privacy because he was on pre-trial release awaiting criminal prosecution and, as a *701 condition of such release, had agreed that he would undergo drug testing. The government had a strong-indeed, a compelling-interest in insuring the accuracy of the drug testing by preventing Norris from giving a false specimen. As the district court stated, “[i]f the government’s interest in conducting the tests is sufficient to allow testing in the first place, certainly the government has a valid interest in ensuring that those tests produce valid and reliable results.” Norris, 2009 WL 3334900 at *5. The record shows that it is easy and widespread for people providing urine for drug testing to substitute false or inaccurate specimens and that only the direct observation method of obtaining such samples is fully effective “to prevent cheating on drug tests,” in the language of the district court. Neither the Kentucky authorities nor Premier acted improperly in requiring that method.
Our disagreement with the dissent relates primarily to the weight to be given to those factors in determining whether the search was reasonable. We give greater weight than the dissent does to the state’s strong interest in providing an accurate urine sample and to Norris’ significantly reduced expectation of privacy in the circumstances.
Norris contends, however, that before Premier could use the direct observation method, it had to have a reasonable suspicion that Norris was likely to cheat on the urine test. But the cases Norris cites for this proposition, all older ones, specifically concluded that less-intrusive methods were adequate to monitor the testing. This is no longer the situation. The Supreme Court has never required individualized suspicion in order to conduct urinalysis. See Vernonia, 515 U.S. at 664, 115 S.Ct. 2386; Skinner, 489 U.S. at 624, 109 S.Ct. 1402. Because the ability to evade or falsify testing has increased, more stringent monitoring procedures are now necessary and therefore reasonable.
Norris also contends that the direct observation method violated his Fourth Amendment rights because it was a “visual strip search.” But however one describes the search, the balancing inquiry under the Fourth Amendment remains the same. See BNSF Ry. Co. v. U.S. Dep’t of Transp., 566 F.3d 200, 208 (D.C.Cir.2009) (citing Bell v. Wolfish, 441 U.S. 520, 559-60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).
United States v. Scott, 450 F.3d 863 (9th Cir.2006), upon which Norris seemingly relies, does not support his claim. There the Ninth Circuit held that the police could not require someone accused of crime to agree, as a condition of pretrial release, to submit to random drug testing. The court held that because the government did not have probable cause to believe that the individual was using drugs, it could not impose that requirement as a condition of pretrial release. Id. at 872. In so holding, the court rejected the government’s claim that “the search regime to which Scott was subjected was necessary to ensure his appearance at trial.” Id. at 871. In essence, the Ninth Circuit held that in the circumstances there presented, the police required probable cause before they could thus search someone on pretrial release.
Norris, however, has disclaimed any challenge to the validity of Kentucky’s policy of conditioning pretrial release upon consent to random drug testing. We cannot say how the Ninth Circuit would react to the narrower question we here decide, relating only to the method that Premier used in conducting the test.
E. Our conclusion accords with that of the other federal court of appeals that most recently considered and upheld the validity under the Fourth Amendment of the direct observation method of obtaining urine samples. In BNSF, the District of *702 Columbia Circuit upheld, against challenges under the Fourth Amendment and the Administrative Procedures Act, a federal regulation that required employees in certain public transportation industries who had failed or refused to take a drug test to pass a series of drug tests “conducted under direct observation” before “performing any safety-sensitive duties.” 566 F.3d at 202. In “find[ing] the challenged regulation facially valid under the Fourth Amendment,” id. at 208, the court characterized the “government’s interest in transportation safety” as “compelling.” Id. at 206. It ruled that “[g]iven the proliferation of cheating devices, we have little difficulty concluding that direct observation furthers the government’s interest in effective drug testing,” and that the “government thus has a strong interest in conducting direct observation testing to ensure transportation safety.” Id. Balancing the governmental interest against the “extremely invasive” nature of direct observation, the court stated:
[T]he Department has reasonably concluded that the proliferation of cheating devices makes direct observation necessary to render these drug tests — needed to protect the traveling public from lethal hazards — effective. Weighing these factors, we strike the balance in favor of permitting direct observation testing in these circumstances.
Id. at 208.
The court distinguished its earlier decision in NTEU v. Yeutter, 918 F.2d 968 (D.C.Cir.1990), which had held unconstitutional a regulation requiring the direct observation method of obtaining a urine sample for drug testing that “rested on reasonable suspicion of drug use but no suspicion of cheating,” because the record in that case indicated that less evasive testing procedures “were adequate to detect cheating.” BNSF, 566 F.3d at 208. The BNSF court concluded:
Given the proliferation of such cheating devices, here we have a very different record, one that fully supports the Department’s finding that standard monitoring procedures are inadequate. We thus conclude that here, unlike in Yeutter, direct observation testing will “significantly improve testing accuracy.”
Id. (internal citation omitted).
Although there are factual distinctions between the present case and BNSF, the basic rationale of BNSF — that “the proliferation of cheating devices makes direct observation necessary to render these drug tests ... effective,” id. — is equally applicable here.
IV
In view of our holding that Premier’s direct observation method was not an unreasonable search under the Fourth Amendment, we need not consider Premier’s contention that it had qualified immunity for its action.
V
Norris here repeats two of the four state law claims he unsuccessfully argued in the district court. He contends that Premier’s use of the direct observation method of obtaining a urine sample constituted (A) an illegal invasion of his privacy by “intrusion upon the seclusion of another,” and (B) the intentional infliction of emotional distress. The district court correctly granted summary judgment dismissing those claims.
A. In McCall v. Courier-Journal & Louisville Times Co., 623 S.W.2d 882, 887 (Ky.1981), the Supreme Court of Kentucky adopted the Restatement (Second) of Torts (1976) definition of the general tort of invasion of privacy. Id. at 887. McCall dealt only with the specific tort of placing anoth *703 er in “false light.” Because the Supreme Court of Kentucky had not yet addressed the tort of “intrusion upon seclusion of another,” the District Court for the Western District of Kentucky presumed that the Kentucky Supreme Court also would adopt the definition of that tort in the Restatement (Second). See Smith v. Bob Smith Chevrolet, Inc., 275 F.Supp.2d 808, 821-22 (W.D.Ky.2003). We have no reason to disagree with that approach, and therefore apply it here.
To establish intrusion upon seclusion, Norris would have to show “(1) an intentional intrusion by the defendant, (2) into a matter the plaintiff has a right to- keep private, (3) which is highly offensive to a reasonable person.” Id. at 822 (citing Restatement (Second) of Torts § 652B). We have concluded, however, that the direct observation method used here was reasonable under the Fourth Amendment. As the district court noted, it would “defy logic” to now hold that Norris had a “right to keep [the same act] private.” Norris, 2009 WL 3334900 at *5.
B. To establish the tort of intentional infliction of emotional distress in Kentucky, the plaintiff must establish that the defendant’s conduct “has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 789 (Ky.2004) (quoting Restatement (Second) of Torts § 46(1)). Once again, our holding that Premier’s direct observation method of obtaining a urine sample was a reasonable search under the Fourth Amendment establishes that the conduct did not “go beyond all possible bounds of decency” and would not be regarded as “atrocious” or as “intolerable in a civilized community.”
CONCLUSION
The district court’s judgment granting summary judgment for Premier is affirmed.