KAREN NELSON MOORE, Circuit Judge,
dissenting.
Kentucky conducts drug tests on pretrial releasees to increase the likelihood that they will appear at later court proceedings. When conducting the drug tests, Kentucky uses “direct observation” to attain the highest security against adulteration of urine samples. While efficacious, this method is highly invasive: testing supervisors are “required to directly observe the urine coming straight out of the body.” R. 24^1 (Procedures ¶ 14). Participants are “required to lower their pants below their knees. Long, baggy shirts must be raised enough to allow collector visibility of the participant[’]s genitalia. The participant must face the collector for full view and not a side view.” Id.
While conceding that the Fourth Amendment permits drug testing of pretrial releasees, Norris objects to this invasive method of conducting drug tests. Norris has no known history of drug use. He was not charged with a drug crime. At the time of his drug tests, his guilt had not been adjudicated for any crime. And because he was awaiting trial, he had little choice but to sign off on whatever conditions of release Kentucky offered. Based on these facts, I disagree with how the majority balances Norris’s privacy interest, the extent of the intrusion, and the government’s interest. I would reverse the district court’s grant of summary judgment on the Fourth Amendment claim and, derivatively, the intrusion-upon-seclusion privacy claim.
*704 I. NORRIS’S PRIVACY INTEREST
The majority reasons that, by consenting to provide a urine sample, Norris lessened his expectation of privacy. That logic would explain why Norris did not have a privacy interest in his urine sample, and he does not assert that interest. However, it does not explain how Norris’s consent diminished his privacy interest as it relates to the method of drug testing. Consent to a result does not entail consent to the most intrusive method of achieving that result. The fact that Norris might have known that the drug testing would involve “full observation” does little to clarify the issue. Courts have used similar language to describe methods that are meaningfully less invasive than what Norris endured. See Wilcher v. City of Wilmington, 139 F.3d 366, 376-77 (3d Cir.1998) (upholding “direct observation” urine testing, in which monitors, who “observe[d] only the collection process generally and not the particular individual’s genitalia,” stood behind the male firefighters and to the side of the female firefighters).
More importantly, even if Norris knew the drug-testing protocol in advance, the majority overstates the degree to which Norris’s participation in pretrial release diminished his expectation of privacy. The majority cites four cases for that proposition. In one, United States v. Scott, the court found that the infringement of the pretrial releasee’s privacy was so great that it rendered suspicionless drug testing unconstitutional. 450 F.3d 863, 873-74 (9th Cir.2006). The challengers to government searches in both Supreme Court cases on which the majority relies, United States v. Knights, 534 U.S. 112, 118-20, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), and Samson v. California, 547 U.S. 843, 852, 126 S.Ct. 2193,165 L.Ed.2d 250 (2006), had been convicted of crimes and were on probation and parole, respectively. The final case that the majority cites, Wilcher, 139 F.3d at 374, involved firefighters who chose their employment. Prior adjudication of guilt and voluntary employment both serve as “safeguards limiting the extent to which induced or coerced consent could threaten privacy and liberty interests.” Criminal Law — Fourth Amendment — Ninth Circuit Holds that Search of Pretrial Releasee Is Unconstitutional Despite Releasee’s Consent, 119 Harv. L.Rev. 1630, 1635-36 (2006). Prior adjudication of guilt provides a constitutionally relevant distinction, judged in a proceeding that affords due process, on which to base the deprivation of constitutional rights. Voluntary employment signals bargaining power to negotiate or refuse conditions of employment.
Pretrial releasees lack comparable safeguards from Fourth Amendment violations. Faced with even more stringently regulated alternatives, such as jail pending trial, pretrial release is the preferable option, even if its conditions are objectively unreasonable. Cf Samson, 547 U.S. at 863 n. 4, 126 S.Ct. 2193 (Stevens, J., dissenting) (“Whether or not a prisoner can choose to remain in prison rather than be released on parole, he has no ‘choice’ concerning the search condition; he may either remain in prison, where he will be subjected to suspicionless searches, or he may exit prison and still be subject to suspicionless searches. Accordingly, to speak of consent in this context is to resort to a manifest fiction, for the [parolee] who purportedly waives his rights by accepting such a condition has little genuine option to refuse.” (internal quotation and citation omitted)). By arguing that pretrial release is a highly regulated program that should have diminished Norris’s expectation of privacy, the majority begs the question of what regulations are constitutionally permissible. I would not extend Samson to cover pretrial releasees whose *705 guilt has not been adjudicated, and I would conclude that Norris retains a strong privacy interest.
II. INTRUSION
The majority concedes that “Premier’s ‘direct observation’ method of obtaining a urine sample is ‘highly intrusive.’ ” Maj. Op. at 699 (citing Norris v. Premier Integrity Solutions, No. 3:08-CV-209-H, 2009 WL 3334900, at *3 (W.D.Ky. Oct. 15, 2009)). Urine tests “require [subjects] to perform an excretory function traditionally shielded by great privacy.” Skinner v. Ry. Labor Execs. Ass’n, 489 U.S. 602, 626, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The extent of intrusion “depends upon the manner in which production of the urine sample is monitored.” Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 658, 115 S.Ct. 2386,132 L.Ed.2d 564 (1995). Several cases that have upheld urine tests contrasted their facts to the direct observation that Norris endured. For example, in Skinner, the court noted that “[t]he regulations do not require that samples be furnished under the direct observation of a monitor.” 489 U.S. at 626, 109 S.Ct. 1402; see also Vemonia, 515 U.S. at 658, 115 S.Ct. 2386 (upholding conditions “nearly identical to those typically encountered in public restrooms,” in which males “remain[ed] fully clothed” and were “only observed from behind, if at all,” while females used “an enclosed stall” as a monitor “listen[ed] only for sounds of tampering”); Wilcher, 139 F.3d at 376-77. The intrusiveness of direct-observation testing weighs heavily in Norris’s favor.
III. KENTUCKY’S INTEREST
The majority explains that Kentucky has an interest in preventing pretrial releasees from cheating on drug tests. “ ‘[I]f the government’s interest in conducting the tests is sufficient to allow testing in the first place, certainly the government has a valid interest in ensuring that those tests produce valid and reliable results.’ ” Maj. Op. at 701 (quoting Norris, 2009 WL 3334900, at *5).[1] However, the government’s interest in incrementally greater accuracy is not compelling. The government has no reason to suspect that Norris and others like him, who have never been accused of a drug offense, will falsify a drug test. That difference is reflected in the case on which the majority relies, BNSF Railway Co. v. U.S. Department of Transportation, 566 F.3d 200 (D.C.Cir. 2009). In BNSF, the challengers to the drug-testing protocol were public-transit employees engaged in “safety-sensitive duties” and had failed or refused a past drug test. Id. at 202. Norris has no similar history. Individualized suspicion is not required for special-needs searches, but as the suspicion of wrongdoing among a category of people becomes more slight, the government’s interest wanes.
A more closely analogous case is Scott, in which the Ninth Circuit held that the government may not drug test pretrial releasees under either a special-needs approach or the more general totality-of-thecireumstances test. 450 F.3d at 868-75. When considering the government’s interest, the court found that “the connection between the object of the [drug] test (drug use) and the harm to be avoided (nonappearance in court) is tenuous.... [T]he government has produced nothing to suggest [that failure to appear is a] com *706 mon enough problem[ ] to justify intruding on the privacy rights of every single defendant out on pretrial release.” Id. at 870. The majority opinion distinguishes Scott by arguing that Scott challenged the constitutionality of drug testing pretrial releasees regardless of method. But that distinction strengthens Norris’s claim. The privacy interest that Norris has asserted is more narrow than Scott’s, and the government’s interest conflicts less: even if Norris succeeds in his suit, Kentucky can still drug test pretrial releasees using alternative procedures that better protect privacy. Even crediting Kentucky with a greater interest in ensuring appearance at trial than the federal government produced in Scott, see Ky.Rev.Stat. Ann. § 431.064(2)(e) (permitting “[a]n order prohibiting [pretrial releasees] from possession or consumption of alcohol or controlled substances” “to ensure the[ir] appearance ... at a subsequent court proceeding”), Kentucky’s interest in the added protection that direct observation affords is not overpowering.
IV. CONCLUSION
The crux of the majority’s analysis is that, “[b]ecause the ability to evade or falsify testing has increased, more stringent monitoring procedures are now necessary and therefore reasonable.” Maj. Op. at 701. Premier has documented abundant methods for cheating on drug tests. But the possibility of cheating should not justify every precaution that the state deems efficacious. By reaching the opposite conclusion, the majority unravels Fourth Amendment protections for pretrial releasees.
Kentucky has no reason to believe that suspects in non-drug-related crimes with no history of drug use will use drugs while on pretrial release. The risk that they will, nevertheless, falsify drug tests is too attenuated to impose the added protection — and incumbent privacy intrusion — of direct-observation testing. Therefore, in my view, the ability to evade or falsify testing does not strengthen the government’s interest sufficiently to overcome Norris’s expectation of privacy given the extremely intrusive nature of the search. I would reverse the district court’s grant of summary judgment on the Fourth Amendment and intrusion-upon-seclusion privacy claim.

. This logic must apply only to the identification of a valid interest, not the conclusion that the interest renders the government’s action reasonable under the Fourth Amendment. Otherwise, the government could put forward a constitutionally adequate interest and procedure, substitute a far more egregious procedure that slightly enhances reliability, and be exempt from Fourth Amendment challenges to that egregious procedure.